UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

IN RE                                            :          MDL No. 1409
                                                            M 21-95
CURRENCY CONVERSION FEE                          :
ANTITRUST LITIGATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THIS DOCUMENT RELATES TO:                        :

ROBERT ROSS and                                  :
RANDAL WACHSMUTH,
on behalf of themselves and all others           :
similarly situated,                                         04 Civ. 5723 (WHP)
                                                 :
                Plaintiffs,                                 MEMORANDUM AND ORDER
                                                 :
            - against -
                                                 :
AMERICAN EXPRESS COMPANY et al.,
                                                 :
                Defendants.
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

            Robert Ross and Randal Wachsmuth ("Plaintiffs") bring this putative class action

asserting Sherman Act claims against defendants American Express Company, American

Express Travel Related Services and American Express Centurion Bank (collectively,

"Defendants" or "American Express").  Plaintiffs' antitrust claims arise from alleged

conspiracies to fix foreign currency conversion fees and impose arbitration clauses in cardholder

agreements.

            Presently before this Court are Plaintiffs' motion for class certification and

Defendants' motion to compel arbitration under the Federal Arbitration Act ("FAA") and dismiss

or stay this action.  For the reasons set forth below, Plaintiffs' motion is granted in part and

denied in part, and Defendants' motion is denied.

# BACKGROUND

Robert Ross and Randal Wachsmuth hold MasterCard or VISA (the "Networks") credit cards through certain issuing banks.[1] Plaintiffs, the Networks and the Issuing Banks are currently engaged in multi-district litigation before this Court styled In re Currency Conversion Fee Antitrust Litigation, MDL No. 1409 (the "MDL Proceeding").[2] The MDL Proceeding involves claims against the Networks, the Issuing Banks and other issuing banks (collectively with the Issuing Banks, the "MDL Defendant Banks") (collectively, the "MDL Defendants"). Plaintiffs there allege that the MDL Defendants conspired to fix the foreign currency conversion fees charged to cardholders. (Compl. ¶ 1.) Drawing on the conspiracy allegations in the MDL Proceeding, Plaintiffs bring this action against American Express alleging that it "actively

---

[1]  It is undisputed that Ross and Wachsmuth hold MasterCard or VISA credit cards issued by Bank of America, MBNA, Citibank or Chase (collectively, the "Issuing Banks").  Because Plaintiffs can only adequately represent class members who hold the same cards as they do, Ross and Wachsmuth can represent only MasterCard or VISA cardholders of the Issuing Banks.  See Fed R. Civ. P. 23(a); Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 625-28 (1997) (class members must have adequate representative); Marisol A. v. Giuliani, 126 F.3d 372, 378-79 (2d Cir. 1997) (same); see also In re Currency Conversion Fee Antitrust Litig., 229 F.R.D. 57, 64-65 (S.D.N.Y. 2005) ("Currency Conversion IV").

[2]  Familiarity with this Court's prior Memoranda and Orders in the MDL Proceeding is presumed.  See In re Currency Conversion Fee Antitrust Litig., No. M 21-95, 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005) ("Currency Conversion V"); Currency Conversion IV; In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237 (S.D.N.Y. 2005) ("Currency Conversion III"); In re Currency Conversion Fee Antitrust Litig., 224 F.R.D. 555 (S.D.N.Y. 2004) ("Currency Conversion II"); In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385 (S.D.N.Y. 2003) ("Currency Conversion I").

conspired" with the MDL Defendants to fix conversion fees.[3]  (Compl. ¶¶ 1-3.)  Plaintiffs further

assert that American Express "conspired with the MDL Defendant Banks to include compulsory

arbitration clauses in their respective cardholder agreements."  (Compl. ¶ 3.)

VISA, MasterCard and American Express are the three largest general purpose

credit card networks.  (Compl. ¶ 18.)  In 2003, over ninety percent of all purchases made with

general purpose credit cards were made with VISA, MasterCard or American Express cards.

(Compl. ¶ 18.)  The Networks and American Express operate differently.  VISA and MasterCard

are associations "created, owned, governed, and operated by and in the interests of their member

banks."  (Compl. ¶ 22.)  The credit cards of these networks are issued to cardholders through

their member banks.  (Compl. ¶ 18.)  In contrast, American Express is a closed network that

issues cards directly to cardholders.  (Compl. ¶ 19.)

I.      Currency Conversion Fees

VISA, MasterCard and American Express each allow United States cardholders

to enter into transactions in foreign currencies.  (Compl. ¶¶ 28, 48.)  In return, the networks

assess a fee for their service.  VISA and MasterCard cardholders pay a two-tiered foreign

currency conversion fee.  (Compl. ¶ 31.)  The first tier constitutes one percent of the foreign

transaction amount charged by cardholders and is retained by the Networks.  (Compl. ¶¶ 2, 31.)

The second tier typically equals two percent of the transaction amount and is retained by the

---

[3]  This case is not brought on behalf of American Express cardholders but on behalf of VISA or
MasterCard cardholders of the Issuing Banks.  A class action against American Express by its
cardholders concerning its conversion fee practices is pending in the Southern District of Florida.
See LiPuma v. American Express Co. et al., No. 04-20314 (S.D. Fla.).  In that action, the court
has conditionally approved a settlement.  (Declaration of Jamie L. Berger, dated March 25, 2005
("Berger Decl.") Ex. M: LiPuma Amended Stipulation and Agreement of Settlement, dated June
9, 2004 (the "LiPuma Agreement").)

MDL Defendant Banks.  (Compl. ¶ 31.)  American Express, in contrast, assesses a single fee for its currency conversion service that equals two percent of the transaction amount.  (Compl. ¶¶ 19, 48.)

American Express and the MDL Defendant Banks disclosed their respective conversion fees in cardholder agreements, change-in-terms notices and initial disclosure statements.  (Compl. ¶ 44.)  Plaintiffs allege, however, that because those fees were not disclosed in application solicitations or the cardholders' monthly billing statements, the Networks, the MDL Defendant Banks, Diners Club and American Express concealed both the existence and amount of the conversion fees imposed.  (Compl. ¶¶ 41, 42.)  In particular, Plaintiffs contend that it is impossible to extrapolate the conversion fee for a given transaction based on the information provided in their monthly billing statements.  (Compl. ¶¶ 42, 43.)

Plaintiffs also allege that after American Express raised its conversion fee to two percent, it co-sponsored a meeting on May 25, 1999 attended by certain MDL Defendant Banks, including Citigroup and Chase.  (Compl. ¶¶ 49, 50.)  According to Plaintiffs, at that meeting the MDL Defendant Bank attendees learned that American Express did not disclose its conversion fee in billing statements.  Plaintiffs further contend that the MDL Defendant Bank attendees discussed the possibility of assessing a two-percent fee.  (Compl. ¶ 51.)  Following that meeting, all of the MDL Defendant Banks, except MBNA, implemented a uniform two-percent conversion fee.  (Compl. ¶ 52.)  Based on these allegations, Plaintiffs assert that "[t]he MDL Defendant Banks, together with American Express, conspired to fix and maintain the amount of the second tier fee at an agreed-upon level, and . . . to restrain competition by concealing the fee."  (Compl. ¶ 39.)

II.     <u>Arbitration Clauses</u>

When this lawsuit was filed on July 22, 2004, the cardholder agreements from each of the MDL Defendant Banks contained an arbitration provision.  (<u>See e.g.</u>, Declaration of Suzan R. Uhlig, dated Feb. 12, 2004 ("Uhlig Decl.") at ¶¶ 5-7 (Bank of America); Declaration of Deborah L. Fisher, dated Feb. 11, 2004 ("Fisher Decl.") at ¶¶ 4-8 (MBNA); Declaration of Susan Bridge, dated Feb. 18, 2004 ("Bridge Decl.") at ¶¶ 7-13 (Citibank); Affidavit of Stephen J. Farrell, dated Jan. 5, 2005 ("Farrell Aff.") at ¶¶ 3-6 (Chase).)  The arbitration clauses require cardholders, who did not reject such terms, to arbitrate all claims arising out of their respective cardholder agreements, including claims regarding the applicability of the arbitration clause itself.  (<u>See e.g.</u>, Uhlig Decl. Ex. A; Fisher Decl. Ex. 2; Bridge Decl. Ex. 1; Farrell Aff. Ex. A.) In substantially similar language, the agreements provide:

> Any dispute, claim, or controversy ("Claim") by or between you and us (including each other's employees, agents or assigns) arising out of or relating to this Agreement, your Account, or the validity or scope of any provision of this Agreement, including the arbitration clause shall, upon election by either you or us, be resolved by binding arbitration.  Arbitration shall take place before a single arbitrator on an individual basis without resort to any form of class action.  Arbitration may be selected at any time unless a judgment has been rendered or the other party would suffer substantial prejudice by the delay in demanding arbitration.
> ***
> This arbitration section of this Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.
> ***
> YOU UNDERSTAND AND AGREE THAT IF EITHER YOU OR WE ELECT TO ARBITRATE A CLAIM, THIS ARBITRATION SECTION PRECLUDES YOU AND US FROM HAVING A RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH COURT, OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS.  EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST BE RESOLVED THROUGH ARBITRATION IF YOU OR WE ELECT TO ARBITRATE.

(Uhlig Decl. Ex. A.; <u>see e.g.</u>, Fisher Decl. Ex. 2; Bridge Decl. Ex. 1; Farrell Aff. Ex. A.)

Plaintiffs assert that representatives of American Express attended several meetings with representatives of their competitors between July 1999 and April 2003 "to discuss the implementation of compulsory arbitration clauses on general purpose cardholders in an effort to impede consumer litigation with a particular emphasis on class actions." (Compl. ¶¶ 55-56.) These meetings became known among attendees as the "Arbitration Users Group," "Arbitration Group" and the "Coalition." (Compl. ¶ 56.)

III.    <u>Plaintiffs' Claims and the Putative Class</u>

Plaintiffs assert two Sherman Act claims. Their first claim alleges that "American Express participated in a conspiracy with the MDL Defendants and their co-conspirators to artificially raise, fix, inflate and maintain foreign transaction fees, and is jointly and severally liable for the damages of that conspiracy." (Compl. ¶ 82.) The second claim asserts that "American Express participated in a conspiracy to impose compulsory arbitration clauses on its cardholders and the cardholders of its co-conspirators . . . to suppress competition and deprive their cardholders of a meaningful choice concerning the arbitration of disputes." (Compl. ¶¶ 86, 88.)

Plaintiffs propose certification of the following damages class:

> [A]ll VISA, MasterCard, Diners Club general purpose cardholders
> who used cards issued by any of the MDL Defendant Banks during
> the Damages Period, and were assessed a foreign transaction fee
> for using such cards to purchase goods and/or services
> denominated in foreign currency.

(Compl. ¶ 71.)  In addition, Plaintiffs seek to certify an injunctive relief class comprised of:

> [A]ll VISA, MasterCard, Diners Club general purpose cardholders
> of the MDL Defendant Banks.

(Compl. ¶ 72.)  American Express moves to dismiss or, in the alternative, to stay this action in favor of arbitration.


## DISCUSSION

I.    Arbitration

There is a "strong federal policy favoring arbitration." ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 29 (2d Cir. 2002); Coca-Cola Bottling Co. v. Soft Drink & Brewery Workers Union Local 812, 242 F.3d 52, 57 (2d Cir. 2001); Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983); accord Green Tree Fin. Corp v. Bazzle, 539 U.S. 444, 452 (2003).

On a motion to compel arbitration under Section 4 of the FAA, the Court must be "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.  In determining whether to compel arbitration, courts must consider: (i) whether a valid arbitration agreement exists; (ii) the scope of such agreement; and (iii) whether Congress intended that the claims at issue be arbitrable.  See Garten v. Kurth, 265 F.3d

136, 142 (2d Cir. 2001) ("[B]efore the court compels arbitration of a claim, the court must find that a valid agreement to arbitrate exists."); see also Oldroyd, 134 F.3d at 75-76; Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987); Lewis Tree Serv., Inc. v. Lucent Techs. Inc., 239 F. Supp. 2d 332, 335-36 (S.D.N.Y. 2002).

American Express is not a signatory to the cardholder agreements between Plaintiffs and their Issuing Banks. As such, American Express seeks to invoke the arbitration clauses in those agreements by estoppel. This Court addresses the Defendants' estoppel argument first to determine whether arbitration is available to American Express.


A.     Arbitration Based on Estoppel

"[U]nder principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of 'the relationship among the parties, the contracts they signed . . . and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" JLM Industries, Inc. v. Stolt-Nielsen, S.A., 387 F.3d 163, 176 (2d Cir. 2004) (quoting Choctaw Generation Ltd P'ship v. Am. Home Assurance Co., 271 F.3d 403, 406 (2d Cir. 2001)); accord Denney v. BDO Seidman, L.L.P., 412 F.3d 58, 70 (2d Cir. 2005).

The parties dispute whether American Express shared a sufficiently close relationship with the Issuing Banks to benefit from their arbitration clauses. American Express contends that conspiracy allegations alone establish the requisite close relationship. (Defendants' Memorandum in Support of Motion to Dismiss, dated Apr. 11, 2005 ("Defs. Arb. Mem.") at 8-9, 11.) Plaintiffs counter that a nonsignatory must demonstrate a close business

relationship independent of the alleged conspiracy for estoppel to apply. (Plaintiffs'
Memorandum in Opposition to Motion to Dismiss, dated Apr. 28, 2005 ("Pls. Arb. Opp. Mem.")
at 4-7.)

In <u>JLM</u>, the Second Circuit concluded that based on the injury alleged, the
agreements entered and the alleged conspiracy, nonsignatories could invoke arbitration
provisions by way of estoppel. <u>JLM</u>, 387 F.3d at 178 n.7. The Court of Appeals cautioned,
however, that it did not "mean to suggest that a claim against a co-conspirator of a party alleged
to have engaged in antitrust violations will always be intertwined to a degree sufficient to work
an estoppel. The inquiry remains a fact-specific one." <u>JLM</u>, 387 F.3d at 178 n.7.

After this Court heard oral argument, the Court of Appeals ruled that allegations
of concerted misconduct between a signatory and a nonsignatory could establish a close
relationship between them. <u>Denney</u>, 412 F.3d at 70 (citing <u>Grigson v. Creative Artists Agency,
L.L.C.</u>, 210 F.3d 524, 527 (5th Cir. 2000); <u>MS Dealer Serv. Corp. v. Franklin</u>, 117 F.3d 942, 947
(11th Cir. 1999)); <u>see also</u> <u>Vaughn v. Leeds, Morelli & Brown, P.C.</u>, No. 04 Civ. 8391 (DLC),
2005 WL 1949468, at *5 (S.D.N.Y. Aug. 12, 2005) (holding that under the rule in <u>Denney</u>,
plaintiff's "basic premise that Second Circuit precedent requires . . . a close relationship
independent of the alleged conspiracy is . . . incorrect"); <u>see generally</u> <u>Currency Conversion V</u>,
2005 WL 1871012, at *5. In <u>Denney</u>, plaintiffs asserted RICO claims against BDO Seidman,
L.L.P. ("BDO") and other defendants in connection with certain tax transactions. Plaintiffs and
BDO entered consulting agreements that included arbitration provisions. <u>Denney</u>, 412 F.3d at
61-61. On appeal, the Second Circuit considered whether the Deutsche Bank defendants, who
were nonsignatories to the consulting agreements, could invoke the BDO arbitration clauses.

Regarding the relationship necessary for estoppel, the Court of Appeals held:

> Having alleged in this RICO action that the Deutsche Bank and
> BDO defendants acted in concert to defraud plaintiffs, . . . and
> that defendants' fraud arose in connection with BDO's tax
> strategy advice, . . . plaintiffs cannot now escape the
> consequences of those allegations by arguing that the Deutsche
> Bank and BDO defendants lack the requisite close relationship, or
> that plaintiffs' claim against the Deutsche Bank defendants are
> not connected to Deutsche Bank's relationship with BDO.

Denney, 412 F.3d at 70 (citing Grigson, 210 F.3d at 527; MS Dealer, 117 F.3d at 947).

Here, Plaintiffs allege that "American Express has actively conspired with the MDL Defendants to fix, maintain, and conceal the artificially inflated second tier fee and to increase its own foreign transaction fee." (Compl. ¶ 2.) In addition, Plaintiffs assert that "[i]n furtherance of this conspiracy, American Express has also conspired with the MDL Defendant Banks to include compulsory arbitration clauses in their respective cardholder agreements in a concerted effort to reduce (or eliminate) their potential liability arising from their illegal conduct." (Compl. ¶ 2.) Having alleged that American Express acted in concert with the MDL Defendant Banks, Plaintiffs "cannot now escape the consequences of those allegations by arguing that" American Express and the MDL Defendant Banks "lack the requisite close relationship" or that their Sherman Act claims against American Express "are not connected to" that relationship. See Denney, 412 F.3d at 70; see also Vaughn, 2005 WL 1949468, at *5 (holding plaintiff estopped from avoiding arbitration based on conspiracy allegations). Thus, this Court concludes that American Express has established a "close relationship" with the Issuing Banks.

In addition to the relationship requirement, estoppel is appropriate only where the dispute the nonsignatory seeks to arbitrate is "intimately founded in or intertwined with" the underlying agreement contemplating arbitration. Denney, 2005 WL 1389911, at *9 (internal

quotation omitted); see also Astra Oil Co. v. Rover Navigation Ltd., 344 F.3d 276, 279-80 (2d Cir. 2003); Choctaw, 271 F.3d at 406; Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 98 (2d Cir. 1999). With respect to this inquiry, however, the Court of Appeals has "had no occasion to specify the minimum quantum of 'intertwined-ness' required to support a finding of estoppel." JLM, 387 F.3d at 178; see also Currency Conversion V, 2005 WL 1871012, at *5. Although no threshold of relatedness has been established, in JLM the Second Circuit concluded that based on plaintiffs' allegations that all defendants conspired to fix terms with respect to "any one such contract, any claim against [a defendant] jointly liable for the injury caused by that contract is inextricably intertwined with the arbitrable claim against the [defendant] liable under that contract." JLM, 387 F.3d at 178 n.7.

This Court finds that the requisite degree of relatedness has been met here. As in JLM, Plaintiffs' antitrust claims against American Express are "inextricably intertwined" with the cardholder agreements. Plaintiffs hold Network credit cards of the Issuing Banks and their injuries stem from their cardholder agreements. As set forth above, the conversion fees that American Express conspired to fix were assessed pursuant to such cardholder agreements. (Compl. ¶ 44.) Similarly, Plaintiffs claim that American Express conspired with the MDL Defendant Banks to insert arbitration clauses into these same agreements. (Compl. ¶¶ 58, 88.) Indeed, Plaintiffs' entire theory of joint and several liability stems from the cardholder agreements they entered. Because Plaintiffs' antitrust claims against American Express derive from the very same agreements Defendants endeavor to enforce, this Court concludes that, if applicable, American Express may avail itself of the arbitration clauses based on estoppel. See Denney, 2005 WL 1389911, at *9; JLM, 387 F.3d at 178 n.7.

B.        Citibank and Chase Cardholders

         In the MDL Proceeding, this Court held that Citibank and Chase could not enforce their respective arbitration clauses because they were added after the MDL Proceeding commenced. Currency Conversion III, 361 F. Supp. 2d at 249-54. Based on Currency Conversion III, Plaintiffs argue that American Express, as a nonsignatory to the Citibank and Chase agreements, cannot benefit from arbitral rights greater than those extended to signatories. (Plaintiffs' Supplemental Memorandum in Opposition to Arbitration, dated May 31, 2005 ("Pls. Supp. Mem.") at 2-6.)

         Whether a nonsignatory's rights may rise higher than a signatory's, however, is not at issue. As set forth above, this Court found that Citibank and Chase could not enforce their arbitration provisions because they "added them, without notice, after this litigation commenced." Currency Conversion III, 361 F. Supp. 2d at 254. Further, this Court limited its ruling to the claims in the MDL Proceeding "because it was information about [that] litigation that Chase and Citibank omitted from their change of terms notices." Currency Conversion III, 361 F. Supp. 2d at 258.

         Plaintiffs initiated this action on July 22, 2004, over two years after Citibank and Chase amended their respective cardholder agreements to include arbitration provisions. When Citibank and Chase added the arbitration clauses, they could not predict the filing of this lawsuit and, therefore, could not have provided any notice of this action. Accordingly, this Court's concern in Currency Conversion III regarding proper notice to Citibank and Chase cardholders is not present here. See Currency Conversion III, 361 F. Supp. 2d at 258. Thus, American Express may avail itself of the Citibank and Chase arbitration provisions against Citibank and Chase cardholders.

C.    Validity of the Arbitration Clauses

Having found that arbitration may be available to American Express, this Court must now consider whether arbitration can be compelled in light of Plaintiffs' claim that the clauses were imposed pursuant to an illegal antitrust conspiracy.  (Compl. ¶¶ 85-90.)  For the following reasons, this Court concludes that Plaintiffs have raised a genuine issue of fact concerning the validity of the arbitration clauses that must be resolved by a trial.  See  9 U.S.C. § 4.

Under the FAA, written agreements to arbitrate "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A "party resisting arbitration of course may attack directly the validity of the agreement to arbitrate . . . and may attempt to make a showing that . . . the agreement was affected by fraud, undue influence, or overwhelming bargaining power, that enforcement would be unreasonable and unjust, or that proceedings in the contractual forum will be so gravely difficult and inconvenient that the resisting party will for all practical purposes be deprived of his day in court."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 632 (1985) (internal quotation and citations omitted); see also Endriss v. Eklof Marine Corp., No. 96 Civ. 3137 (KMW), 1998 WL 1085911, at *5 (S.D.N.Y. July 28, 1998); Evans & Sutherland Computer Corp. v. Thomson Training & Simulation Ltd., No. 94 Civ. 6795 (JFK), 1994 WL 593808, at *4 (S.D.N.Y. Oct. 28, 1994).  When a party challenges the validity of an arbitration clause directly, "the federal court may proceed to adjudicate it."  Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967); JLM, 387 F.3d at 170; ACE Capital, 307 F.3d at 29; Campaniello Imps., Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 666 (2d Cir. 1997).

By their antitrust claim asserting that American Express participated in an illegal conspiracy to impose the arbitration clauses at issue, Plaintiffs have challenged the origination of the clauses.  (Compl. ¶¶ 85-90.)  Defendants counter that this Court has already found the arbitration clauses at issue enforceable in Currency Conversion I and III and therefore, Plaintiffs cannot avoid the same provisions on identical claims.  A significant distinction between the MDL Proceeding and this case is that Plaintiffs have asserted that the arbitration clauses stemmed from an unlawful conspiracy in violation of the antitrust laws.  (Compl. ¶¶ 85-90.)  In sharp contrast, Plaintiffs asserted no such claim in the MDL Proceeding.  Indeed, this Court specifically recognized that distinction in Currency Conversion III when it noted "[w]hile plaintiffs seem to assert that the collusion [to impose arbitration clauses] is an antitrust violation, . . . no such allegation is advanced in the Complaint."  Currency Conversion III, 361 F. Supp. 2d at 259.  Guided by the Second Circuit's ruling in Viacom International Inc. v. Tandem Productions, Inc., 526 F.2d 593, 596-600 (2d Cir. 1975), this Court noted that an antitrust violation may not be raised as a defense to a contract action where the aggrieved party can pursue that claim in a separate action.  Currency Conversion III, 361 F. Supp. 2d at 259; see Viacom, 526 F.2d at 596-600 ("An easy toleration of antitrust defenses to contract actions would threaten to involve parties . . . in litigation so protracted and expensive that they might be coerced into unsatisfactory settlements or be compelled to forego any prosecution of their claims.").  This Court went on to hold that Plaintiffs' collusion defense could not bar the enforcement of the arbitration clauses where such enforcement would not perpetrate the alleged Sherman Act violation.  Currency Conversion III, 361 F. Supp. 2d at 259 (citing Kelly v. Kosuga, 358 U.S. 516, 518); see also Viacom, 526 F.2d at 593; Rooney v. Columbia Pictures Indus., Inc., 538 F. Supp. 211, 229 (S.D.N.Y. 1982).

In this case, however, Plaintiffs assert an antitrust claim based on the genesis of

the arbitration clauses. "It is . . . well established . . . that a federal court has a duty to determine

whether a contract violates federal law before enforcing it." <u>Kaiser Steel Corp. v. Mullins</u>, 455

U.S. 72, 84; <u>Contemporary Mission, Inc. v. Bonded Mailings, Inc.</u>, 671 F.2d 81, 83-84 (2d Cir.

1982) ("If a contract is not itself unlawful, the bargain may still be illegal if it is closely

connected with an unlawful act."); <u>Dervin Corp. v. Banco Bilbao Vizcaya Argentaria</u>, No. 03

Civ. 9141 (PKL), 2004 WL 1933621, at *3 (S.D.N.Y. Aug. 30, 2004) (same). As discussed

below, this Court cannot conclude, as a matter of law, that enforcing the clauses would not "be

enforcing the precise conduct made unlawful by the [Sherman Act.]." <u>Kelly</u>, 358 U.S. at 520;

<u>see</u> <u>Viacom</u>, 526 F.2d at 597; <u>see also</u> <u>Currency Conversion III</u>, 361 F. Supp. 2d at 258-59.

Under Section 4 of the FAA, "[i]f the making of the arbitration agreement . . . [is]

in issue, the court shall proceed summarily to a jury trial thereof." 9 U.S.C. § 4. This section

"has been held to encompass any challenge to the validity of the agreement, even if there is no

disagreement that it was 'made.'" <u>Matterhorn, Inc. v. NCR Corp.</u>, 763 F.2d 866, 868 (7th Cir.

1985); <u>see generally</u> <u>Garten</u>, 265 F.3d at 142 (under Section 4 the court must determine whether

a valid arbitration clause exists). Plaintiffs, by resisting arbitration, bear the burden of

demonstrating that there are disputed facts raising a genuine issue for trial. <u>Doctor's Assocs.,</u>

<u>Inc. v. Distajo</u>, 107 F.3d 126, 129-30 (2d Cir. 1997); <u>see also</u> <u>Specht v. Netscape Commc'ns</u>

<u>Corp.</u>, 306 F.3d 17, 27 n.12 (2d Cir. 2002). "To establish a genuine issue entitling a party to a

jury trial, an unequivocal denial that the agreement to arbitrate had been made is needed and

some evidence should be produced to substantiate the denial." <u>Doctor's Assocs., Inc. v. Stuart</u>,

85 F.3d 975, 984 (2d Cir. 1996) (internal quotation and citation omitted); <u>Interbras Cayman Co.</u>

v. Orient Victory Shipping Co., 663 F.2d 4, 7 (2d Cir. 1981). Plaintiffs have satisfied their burden in this regard.

From the outset, Plaintiffs have contended that the arbitration agreements stem from an illegal antitrust conspiracy. (Compl. ¶¶ 3, 55-58, 85-90 ("By colluding with its competitors to insert compulsory arbitration clauses in its cardholder agreements, American Express and its co-conspirators intended to suppress competition and deprive their cardholders of a meaningful choice concerning the arbitration of disputes."); Pls. Arb. Opp. Mem. at 10-15 ("The underlying clauses are invalid because they are unconscionable, contracts of adhesion and they were collusively imposed in violation of the Sherman Act."); Transcript of Oral Argument on May 18, 2005 ("Tr.") at 28 ("Count Two challenges the arbitration clause itself as an adhesion clause, the product of collusion and something that is unenforceable. It was the product of an unlawful conspiracy . . . [s]o we are entitled to a trial on this issue which is squarely at issue before we can be sent to arbitration.").)

Plaintiffs have also submitted evidence to support their claim and, thus, are entitled to a trial under Section 4. See Stuart, 85 F.3d at 984; Interbras, 663 F.2d at 7. Plaintiffs maintain that Defendants formed a group known as the "Arbitration Coalition" or the "Arbitration Users Group" (the "Coalition"), which eventually included all of the MDL Defendant Banks. (Declaration of Jennifer MacNaughton, dated Feb. 17, 2005 ("MacNaughton Decl.") Ex. 22: List of Attendees for Known Meetings; Pls. Arb. Opp. Mem. at 14; Pls. Class Cert. Mem. at 11.) Apparently, the Coalition met on at least fifteen occasions from July 28, 1999 through April 22, 2003. (McNaughton Decl. Ex. 22.) During those meetings, Plaintiffs allege the participants "drew upon their collective market power . . . to develop, hone and implement their compulsory arbitration clauses." (Pls. Arb. Opp. Mem. at 15; see also Declaration of David

A. Langer, dated Apr. 28, 2005, ("Langer Decl."), Ex. 2: The Nilson Report, February 2005 (reflecting American Express and MDL Defendant Banks together possess over 67 percent of the market for general purpose credit cards); MacNaughton Decl. Ex. 22.) Further, industry collaboration is a recurring item on Coalition agendas. (MacNaughton Decl. Ex. 24: Class Action Discussion Group Agenda, dated Dec. 14, 2000; MacNaughton Decl. Ex. 25: Email Reflecting Meeting Agenda, dated February 2, 2001; MacNaughton Decl. Ex. 26 Annotated Talking Points.)

Finally, Plaintiffs offer evidence that when the Coalition was conceived, only American Express and First USA imposed arbitration clauses prohibiting cardholders from participating in class actions. However, "[d]uring the course of the Coalition meetings, all of the remaining MDL Defendants Banks instituted similar arbitration provisions." (Plaintiffs' Memorandum in Support of Motion for Class Certification, dated February 18, 2005 ("Pls. Class Cert. Mem.") at 12 n.13.; McNaughton Decl. Ex. 30: Excerpts of Declaration of Deborah L. Fisher (MBNA clause in December 1999); Ex. 31: Excerpts of Declaration of Suzan R. Uhlig (Bank of America clause in February and April 2000); Ex. 32: Excerpts of Declaration of Athena Tracey (Household clause in April and May 2000); Ex. 33: Excerpts of Declaration of Debra Martinez (Providian clause in March and September 2001 and January 2002); Ex. 34: Excerpts of Declaration of Debra Quella (Diners Club clause in November 2001); Ex. 35: Excerpts of Declaration of Susan Bridge (Citibank clause in September and October 2001); Ex. 36: Excerpts of Declaration of Stephen J. Farrell (Chase clause in March 2002).) Defendants respond, with a bare ipse dixit that "[t]here is absolutely no evidence, none whatsoever, of any conspiracy." (Tr. at 43.) They contend that Plaintiffs' evidence reveals nothing other than meetings among lawyers representing credit card organizations on arbitration issues. (Tr. at 43-44; Defendants'

Reply Memorandum in Support of Motion to Dismiss, dated May 6, 2005 ("Defs. Arb. Reply Mem.") at 8.)  American Express also asserts that every Coalition meeting began with an "admonition" that it was in conformity with the antitrust laws.  (Tr. at 44; see also McNaughton Decl. Ex. 24.)  Apart from counsel's assertions concerning the antitrust admonition, he deflected the Court's inquiry about the Coalition by acknowledging, "I can't really answer that because I don't think it's any kind of official organization."  (Tr. at 43.)

Thus, this Court concludes that genuine issues concerning the legality of the arbitration clauses exist.  In their Complaint, Plaintiffs demand a jury trial "of all issues triable as of right by a jury."  (Compl. at 27.)  Plaintiffs later amended their demand to specifically seek a jury trial of all "issues relating to the making of any arbitration agreement sought to be enforced or invoked in this matter."  (Plaintiffs' Jury Demand, dated May 18, 2005.)  Since Section 4 of the FAA requires a jury trial when the validity of an arbitration clause is in issue, Defendants' motion to compel arbitration and dismiss or stay this proceeding is denied.  9 U.S.C. § 4; see Specht, 306 F.3d at 28 (determination under Section 4 should be based on a "well-developed record"); Distajo, 107 F.3d at 126-30 (jury trial appropriate under Section 4 where material facts are disputed); Stuart, 85 F.3d at 984 (same); Interbras, 663 F.2d at 7 (same); Endriss, 1998 WL 1085911, at *5 (finding trial necessary under Section 4 of the FAA on plaintiff's claims irrespective of whether plaintiff will ultimately prevail).

II.     <u>Class Certification</u>

        Plaintiffs move under Rule 23 to certify a damages class with respect to their

conversion fee antitrust claim and an injunctive relief class for both their conversion fee and

arbitration clause claims.  In light of this Court's ruling regarding the arbitration clauses,

considering class certification with respect to Plaintiffs' conversion fee claim is premature.  With

respect to the arbitration clause claim, a jury trial determination under Section 4 of the FAA

would also be dispositive of liability on that claim.  Accordingly, this Court addresses only

whether certification of an injunctive relief class with respect to liability is appropriate for

Plaintiffs' arbitration clause claim.[4]  <u>See</u> Fed. R. Civ. P. (c)(4)(A) ("an action may be brought or

maintained as a class action with respect to particular issues"); <u>see also</u> <u>Robinson v. Metro North

Commuter R.R. Co.</u>, 267 F.3d 147, (2d Cir. 2001) (certification of class under 23(b)(2)

appropriate for liability where certification "would both reduce the range of issues in dispute and

promote judicial economy").

        Under Rule 23, a plaintiff must satisfy the numerosity, commonality, typicality

and adequacy of representation requirements of Rule 23(a) and show that that a class action is

maintainable under Rule 23(b)(1), (2) or (3).  Fed. R. Civ. P. 23(a)-(b); <u>In re Simon II Litig.</u>, 407

F.3d 125, 132-33 (2d Cir. 2005); <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124,

132-33 (2d Cir. 2001).  Courts must conduct a "rigorous analysis" to ascertain whether Rule 23

---

[4]  Based on the class certification issues this case shares with the MDL Proceeding, Plaintiffs
incorporate by reference their class certification papers in that proceeding.  (Pls. Class Cert.
Mem. at 13 n.14.)  Defendants also recognize significant overlap and adopt and incorporate by
reference certain of the MDL Defendants' arguments in that proceeding.  (Defendants'
Memorandum in Opposition to Motion for Class Certification, dated March 25, 2005 ("Defs.
Class Cert. Opp. Mem.") at 24-25.)  Because this Court addressed many of the class certification
issues raised by the parties in <u>Currency Conversion II</u>, <u>III</u> and <u>IV</u>, it refers those the rulings on
the issues the parties incorporate by reference.  In addition, this Court refers to <u>Currency
Conversion II</u>, for its detailed Rule 23 class certification discussion.

requirements have been satisfied. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982); accord

Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999). Further, Rule 23 is

to be construed liberally, Marisol A., 126 F.3d at 377, with the burden of establishing its tenets

on the party seeking class certification, Amchem, 521 U.S. at 614; Caridad, 191 F.3d at 291.

Courts should regard the allegations in the complaint as true in considering such a motion,

Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978), and in

making its determination, a court may refer to materials outside the pleadings, Kaczmarek v.

Int'l Bus. Mach. Corp., 186 F.R.D. 307, 311 (S.D.N.Y. 1999) (citing Sirota v. Solitron Devices,

Inc., 673 F.2d 566, 571 (2d Cir. 1982)); see also Fox v. Cheminova, Inc., 213 F.R.D. 113, 121-22

(E.D.N.Y. 2003). Moreover, "[i]n determining the propriety of a class action, the question is not

whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but

rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S.

156, 177-78 (1974); Visa, 280 F.3d at 133.


A.     Rule 23(a)(1) Requirements

         Under Rule 23(a)(1), Defendants challenge only the adequacy of the named

plaintiffs to serve as class representatives. Defendants argue that Wachsmuth is not appropriate

because any claims he may have had against American Express regarding its currency

conversion practices were released under the LiPuma class action settlement. American Express

further argues that Wachsmuth and Ross are not appropriate representatives because their claims

are subject to arbitration pursuant to the terms of their cardholder agreements.

         Rule 23(a)(1) requires that "the representative parties will fairly and adequately

protect the interests of the class." Fed. R. Civ. P. 23(a)(1). American Express submits that

pursuant to Section 4.1 of the LiPuma Agreement, Wachsmuth's claims have been released. Section 4.1 releases the claims of American Express cardmembers or accountholders, their spouses and any authorized users of the account. (Berger Decl. Ex. M at 17.) Section 4.1 further provides that "the release does not release the claims of non-American Express cardholders." (Berger Decl. Ex. M at 17.) Wachsmuth does not hold an American Express card. His wife, however, holds an American Express corporate card in the name of her business, France for You LLC. (Berger Decl. Ex. L: Account Statements; Ex. K: Transcript of Deposition of Randal Wachsmuth, dated March 4, 2005 at 48:23.) Wachsmuth is not an authorized user of this account. (Berger Decl. Ex. K at 49:17.)

As discussed below, Defendants have not demonstrated that the LiPuma Agreement applies to Wachsmuth.[5] "It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." Collins, 303 F.3d at 433; see Info. Superhighway, Inc. v. Talk Am., Inc., 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003). When interpreting unambiguous contracts, the terms must be afforded their plain meaning. LaSalle Bank Nat'l Ass'n. v. Nomura Asset Captial Corp., No. 04-5488, --- F.3d ---, 2005 WL 2222269, at *7 (2d Cir. Sept 14, 2005); Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000). The Section 4.1 release extends to claims of spouses of American Express cardmembers. Although it is undisputed that Wachsmuth is Mrs. Wachsmuth's spouse, Mrs. Wachsmuth's American Express account is a corporate account, not a personal account where the term might apply more appropriately. See e.g., Becker v. Becker,

---

[5] Because the Lipuma Agreement provides that it shall be governed by New York law without regard to New York state choice of law principles, this Court applies New York law. (Berger Decl. Ex. M at 24.); see Collins v. Harrison-Bode, 303 F.3d 429, 433 n.1 (2d Cir. 2002) (applying New York law pursuant to settlement agreement provision).

No. FA020388516S, 2004 WL 114460, at *2 (Conn. Super. Ct. 2004) (wife not responsible for husband's American Express corporate card debts); see generally Daugherty v. Daugherty, 816 N.E.2d 1180, 1186-87 (Ind. Ct. App. 2004); Mfr. & Traders Trust Co. v. Lindauer, 513 N.Y.S. 629, 636 (Sup. Ct. 1987). Further, Defendants ignore the exception of claims language in the release. The penultimate sentence of Section 4.1 expressly provides an exception to the release terms preceding it stating, "[h]owever, the release does not release the claims of non-American Express cardholders." (Berger Decl. Ex. M at 18.) Accordingly, because Mr. Wachsmuth is a non-American Express cardholder, this Court concludes that his claims have not been released under the plain meaning of Section 4.1.

Defendants also argue that Plaintiffs are not adequate representatives because their claims must be arbitrated pursuant to the terms of their cardholder agreements. This Court disagrees. Indeed, this is precisely the reason both Wachsmuth and Ross are adequate representatives. Because their claims may be subject to arbitration pursuant to clauses allegedly imposed as a result of an illegal antitrust conspiracy, both Wachsmuth and Ross can adequately represent an injunctive relief class with respect to Plaintiffs' arbitration clause conspiracy claim. See Robinson, 267 F.3d at 170-71 (representative is adequate where he "stands to benefit from any class-wide injunctive relief that may be ordered . . . therefore, plainly [having] an interest in fairly and vigorously pursuing the liability stage" of the claim).

Finally, as discussed above, both Wachsmuth and Ross may only adequately represent class members who hold the same cards they do. See supra note 1; see also Fed R. Civ. P. 23(a); Amchem, 521 U.S. at 625-28 (class members must have adequate representative); Marisol A., 126 F.3d at 378-79 (same); Currency Conversion IV, 2005 WL 1405993, at * 6-7.

B.    23(b)(2) Requirements

Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the entire class," making final injunctive or declaratory relief appropriate.  Fed. R. Civ. P. 23(b)(2); see also Currency Conversion II, 224 F.R.D. at 566; In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 516 (S.D.N.Y. 1996).  As discussed below, certification of an injunctive relief class is appropriate for Plaintiffs' arbitration clause conspiracy claim.

Defendants point to no individual issues that impede certification here.  Plaintiffs allege that American Express "participated in a conspiracy to impose compulsory arbitration clauses on its cardholders and the cardholders of its co-conspirators."  (Compl. ¶ 86.)  Because Plaintiffs' cardholder agreements contain the challenged arbitration clauses, the issue of whether Defendants illegally conspired to impose those clauses "is generally applicable to the entire class."  Fed. R. Civ. P. 23(b)(2); see Currency Conversion II, 224 F.R.D. at 565-67.  This Court rejects Defendants' manageability argument based on class notice.  Class notice is within the court's discretion for classes certified pursuant to 23(b)(2).  See Fed. R. Civ. P. 23(c)(2)(A) advisory committee's note ("The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice."); see also Meachem v. Wing, 227 F.R.D. 232, 234-235 (S.D.N.Y. 2005).

## CONCLUSION

For the reasons set forth above, Defendants' motion to compel arbitration and dismiss or stay this proceeding is denied. In addition, Plaintiffs' motion for class certification is granted in part and denied in part. To the extent Plaintiffs' class certification motion is granted, this Court certifies the following injunctive relief class:

> [A]ll VISA and MasterCard general purpose cardholders of cards issued by the Issuing Banks.

Dated: September 27, 2005
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Copies mailed to:*

*Counsel for Plaintiffs:*

Merrill G. Davidoff, Esq.
Ruthanne Gordon, Esq.
Edward W. Millstein, Esq.
Michael J. Kane, Esq.
David Manger, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

Linda P. Nussbaum, Esq.
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
150 East 52nd Street
30th Floor
New York, NY 10019-6004

Robert J. LaRocca, Esq.
Kohn Swift & Graf, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107

R. Scott Palmer, Esq.
Manuel J, Dominguez, Esq.
Berman DeValerio Pease Tabacco
 Burt & Pucillo
222 Lakeview Avenue
Suite 900
West Palm Beach, FL 33401

Marc Edelson, Esq.
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901

R. Alexander Saveri, Esq.
Guido Saveri, Esq.
Saveri & Saveri
111 Pine Street
Suite 1700
San Francisco, CA 94111-5619

*Counsel for Defendants:*

Jonathan M. Jacobson, Esq.
Wilson Sonsini Goodrich & Rosati
12 East 49th Street
30th Floor
New York, NY 10017

Stuart Alderoty, Esq.
Chief Litigation Counsel
American Express Company
200 Vesey Street
New York, NY 10285