UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x    MDL No. 1409
IN RE                                                    :    M 21-95
CURRENCY CONVERSION FEE                                   :
ANTITRUST LITIGATION                                      :
                                                         :
                                                         :
                                                         :
-------------------------------------------------------------x    Index No.  05 CV 07116 (WHP)
THIS DOCUMENT RELATES TO:                                 :    <u>CLASS ACTION</u>
ROBERT ROSS, et al.,                                      :
                         Plaintiffs,                      :
          -against-                                       :
                                                         :
BANK OF AMERICA, N.A. (USA), et al.,                      :
                                                         :
          Defendants.                                    :
                                                         :
                                                         :
                                                         :
-------------------------------------------------------------x    Index No.  04 CV 5723 (WHP)
ROBERT ROSS, et al.,                                      :    <u>CLASS ACTION</u>
                         Plaintiffs,                      :
          -against-                                       :
                                                         :
AMERICAN EXPRESS COMPANY, AMERICAN                        :
EXPRESS TRAVEL RELATED SERVICES, INC.                     :
and AMERICAN EXPRESS CENTURION BANK,                      :
                                                         :
          Defendants.                                    :
                                                         :
                                                         :
-------------------------------------------------------------x

**CLASS PLAINTIFFS' STATEMENT OF THE ELEMENTS OF EACH
CLAIM TOGETHER WITH A SUMMARY OF THE FACTS RELIED
ON TO ESTABLISH EACH ELEMENT**

**HIGHLY CONFIDENTIAL**

**FILED UNDER SEAL PURSUANT TO CONFIDENTIALITY ORDERS DATED
JUNE 21, 2002, MARCH 29, 2005 and APRIL 21, 2009**

# TABLE OF CONTENTS

I.    Jurisdiction ........................................................................................................1

    A.    Elements of Jurisdiction ............................................................................1

    B.    A Summary of Facts Relied on to Establish Jurisdiction ........................1

II.   Venue ...............................................................................................................1

    A.    Elements of Venue .....................................................................................1

    B.    A Summary of Facts Relied on to Establish Venue ..................................1

III.  Liability ............................................................................................................2

    A.    Elements of a Section 1 Claim under the Sherman Act ............................2

        1.    Horizontal Combination or Conspiracy ...................................2

            a)    Elements of Horizontal Combination or Conspiracy Claim ...........2

            b)    A Summary of Facts Establishing Horizontal Combination or Conspiracy ....................................................................4

        2.    Group Boycott ...............................................................................8

            a)    Elements of Group Boycott Claim ................................................8

            b)    A Summary of Facts Relied on to Establish Group Boycott Claim ...............................................................................8

        3.    Unreasonable Restraint of Trade .................................................9

            a)    Elements of Unreasonable Restraint of Trade ...............................9

            b)    A Summary of Facts Relied on to Establish Unreasonable Restraint of Trade .........................................................................10

IV.   Injunctive Relief Under Section 16 of the Clayton Act ...............................10

    A.    Elements ....................................................................................................10

    B.    A Summary of Facts Relied on to Establish Injunctive Relief ..............11

V.    Antitrust Standing, Including Antitrust Injury .............................................12

    A.    Elements ....................................................................................................12

B.      A Summary of Facts Relied on to Establish Antitrust Standing, Including Antitrust Injury ................................................................................................12

VI.    Article III Standing .............................................................................................13

A.      Elements of Article III Standing ...........................................................13

B.      A Summary of Facts Relied on to Establish Article III Standing ..........13

VII.   Class Certification ...............................................................................................14

A.      Elements for Class Certification ...........................................................14

B.      Summary of Facts Relied on to Establish Class Certification ..............14

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Associated Gen. Contractors of California, Inc. v.
    California State Council of Carpenters*,
    459 U.S. 519 (1983).................................................................................................9

*Brown v. Pro Football, Inc.*,
    518 U.S. 231 (1996)..............................................................................................3, 9

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980) (*per curiam*) .......................................................................9

*In re Currency Conversion Fee Antitrust Litig.*,
    773 F. Supp. 2d 351 (S.D.N.Y. 2011)..............................................................3, 12

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)..................................................................................12

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
    136 F.3d 554 (8th Cir. 1998) ...............................................................................9

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)..............................................................................................3, 9

*Geneva Pharms. Tech. Corp. v. Barr Labs.*,
    386 F.3d 485 (2d Cir. 2004)..................................................................................9

*Int'l Bhd. of Teamsters v. Philip Morris, Inc.*,
    196 F.3d 818 (7th Cir. 1999) (Easterbrook, J.).................................................12

*Int'l Wood Processors v. Powder Dry, Inc.*,
    792 F.2d 416 (4th Cir. 1986) ...............................................................................12

*Kartell v. Blue Shield*,
    749 F.2d 922 (1st Cir. 1984) (Breyer, J.)..........................................................3, 9

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
    468 U.S. 85 (1984)................................................................................................3, 9

*Northern Pac. Ry. Co. v. U.S.*,
    356 U.S. 1 (1958)..................................................................................................9

*Oreck Corp. v. Whirlpool Corp.*,
    579 F.2d 126 (2d Cir. 1978).................................................................................9

*Paramount Famous Lasky Corp. v. United States*,
    282 U.S. 30 (1930)........................................................................................3, 9

*Paycom Billing Servs. Inc. v. MasterCard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006)...............................................................12

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
    364 U.S. 656 (1961)...........................................................................8

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)...........................................................................12

*Ross v. American Express Co.*,
    2005 WL 2364969 (S.D.N.Y. Sept. 27, 2005)....................................14

*Ross v. Bank of America, N.A. (USA)*,
    524 F.3d 217 (2d Cir. 2008)...........................................................9, 13

*Ross v. Bank of America, N.A. (USA)*,
    2012 WL 401113 (S.D.N.Y. Feb. 8, 2012)...................................2, 3, 12

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)...........................................................................9

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) (Cardamone, J.)....................................9

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
    511 F. Supp. 2d 372 (S.D.N.Y. 2007)................................................10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)...........................................................................11

## STATUTES

15 U.S.C. § 1...............................................................................................1, 2, 3, 4

15 U.S.C. § 22...............................................................................................1

15 U.S.C. § 26...............................................................................................4, 10, 12

28 U.S.C. § 1331...........................................................................................1

28 U.S.C. § 1337...........................................................................................1

28 U.S.C. § 1391(b)(2) ...........................................................................................................................1

Section 16 of the Clayton Act, 15 U.S.C. §§ 1, 26 ...............................................................1, 4, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................................................................14

Fed. R. Civ. P. 23(a) & 23(b)(2) .......................................................................................................14

Pursuant to paragraph VI.B.ii of the Individual Practices of the Honorable William H. Pauley, III, Class Plaintiffs state as follows:

# I.   Jurisdiction

## A.   Elements of Jurisdiction

Pursuant to 28 U.S.C. § 1331, the "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  Pursuant to 28 U.S.C. § 1337,  the "district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

## B.   A Summary of Facts Relied on to Establish Jurisdiction

Plaintiffs bring their claims under Section 1 of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. §§ 1, 26, both of which are federal laws and also laws "regulating commerce or protecting trade and commerce against restraints and monopolies."

# II.   Venue

## A.   Elements of Venue

Under 28 U.S.C. § 1391(b)(2), venue lies in a judicial district where "a substantial part of the events or omissions giving rise to the claim occurred."  Under 15 U.S.C. § 22, "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

## B.   A Summary of Facts Relied on to Establish Venue

All the actions currently before the Court were filed in the United States District Court for the Southern District of New York.  No defendant has questioned venue.  Of the 28 known

meetings or conference calls among the Defendants and their co-conspirators, seven occurred in this District.  Of the three Defendants now before the Court, two are headquartered in this District.  All Defendants transact business, and are subject to the Court's jurisdiction, in this District.

## III.   Liability

### A.   Elements of a Section 1 Claim under the Sherman Act

Plaintiffs allege that Defendants collusively implemented and maintained class-barring arbitration clauses ("CBA Clauses") as a term or condition of sale in violation of Section 1 of the Sherman Act, which prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[.]"  15. U.S.C. § 1; *see also Ross v. Bank of America, N.A. (USA)*, 2012 WL 401113, at *4 (S.D.N.Y. Feb. 8, 2012) (denying summary judgment motion by Defendants Citi and Discover).

#### 1.   Horizontal Combination or Conspiracy

##### a)   Elements of Horizontal Combination or Conspiracy Claim

The elements of a Section 1 claim under the Sherman Act are "(1) an agreement **_or_** concerted action among the defendants in the (2) unreasonable restraint of trade."  *Bank of America*, 2012 WL 401113, at *4 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993)) (emphasis added).  Plaintiffs may prove an antitrust violation using "direct **_or_** circumstantial evidence that **_reasonably tends to prove_** the [defendants] had **_a conscious commitment to a common scheme_** designed to achieve an unlawful objective."  *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)) (emphasis added).  "[A]t a minimum, the circumstances must be such as to warrant a [trier of fact] in finding that the conspirators had a unity of purpose **_or_** a common design and

understanding, **_or_** a meeting of the minds in an unlawful arrangement." *Id.* (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987)) (emphasis added).

A violation of Section 1 of the Sherman Act may be inferred from Defendants' (and their co-conspirators') actions, including from "uniform behavior among competitors, preceded by conversations implying later uniformity might be desirable **_or_** accompanied by other conduct that in context suggests that each competitor failed to make an independent decision." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) (emphasis added). Plaintiffs "relying on parallel conduct as evidence of an antitrust conspiracy must also demonstrate the existence of so-called 'plus factors.'" *In re Currency Conversion Fee Antitrust Litig.* ("*Amex SJ*"), 773 F. Supp. 2d 351, 366 (S.D.N.Y. 2011) (*Ross v. American Express* summary judgment opinion); *see also Bank of America*, 2012 WL 401113, at *4 (same). Such plus factors include: "(1) evidence of conduct that is contrary to the defendants' independent self-interest; (2) the presence or absence of a strong motive to enter into the alleged conspiracy; (3) the artificial standardization of products; and (4) a high level of inter-firm communications." *Amex SJ*, 773 F. Supp. 2d at 366 (quoting *In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 218 (E.D.N.Y. 1996)).

"[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it." *Bank of America*, 2012 WL 401113, at *4 (quoting *Apex Oil*, 822 F.2d at 257).

A combination or conspiracy to impose arbitration clauses is a recognized violation of Section 1 of the Sherman Act. *See Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 43-44 (1930); *see also Brown*, 518 U.S. 231, 241 (1996); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 110 n.40 (1984); *Kartell v. Blue Shield*, 749 F.2d 922, 930 (1st Cir. 1984) (Breyer, J.).

Plaintiffs seek injunctive relief, pursuant to Section 16 of the Clayton Act, "against threatened loss or damage by [Defendants'] violation of the antitrust laws."  15 U.S.C. § 26.

The elements as to unreasonable restraint are summarized below.

>    **b)**    **A Summary of Facts Establishing Horizontal Combination or Conspiracy**

Plaintiffs here summarize the facts they will rely upon to establish a violation of Section 1 of the Sherman Act.  This is a summary and is not intended to catalogue all the facts that may be offered at trial.  Plaintiffs will provide any further detail should the Court request it.

Defendants American Express, Citi and Discover, along with their co-conspirators, are the dominant credit card issuers in the country with a collective market share at or exceeding 80% at all relevant times. These dominant credit issuers conspired to implement and maintain CBA Clauses as a term or condition of sale.  Defendants and their co-conspirators had a conscious commitment to a common scheme designed to achieve their goal of promulgating, implementing and protecting industry-wide use of CBA Clauses in disputes with cardholders. Defendants and their co-conspirators: (1) joined together for the purpose of promoting, implementing and protecting their use of CBA Clauses; (2) became well-networked to achieve their common scheme; (3) collectively participated in at least 28 known meetings and conference calls, along with other inter-firm communications concerning arbitration clauses; (4) engaged in conduct contrary to their self-interests; (5) implemented and maintained standardized terms that precluded cardholder participation in class proceedings; and (6) achieved their common objective through the efforts of their in-house counsel.

Each of the above categories of facts is briefly discussed below.

**Defendants and their co-conspirators joined together for the purpose of promoting, implementing and protecting their use of CBA Clauses.**  Defendants organized the

"Arbitration Coalition" or the "Arbitration Users Group," which was admittedly the "only organization uniquely devoted to protecting industry use of arbitration of consumer disputes." The Coalition's meetings were private – not open to the public.  When the Arbitration Coalition was organized, many of the conspirators, including Citi, did not include CBA Clauses in their cardholder term sheets.   Defendants' stated purpose for participating in numerous communications with their competitors through the Arbitration Coalition, as well as through other meetings, conference calls or correspondence (*e.g.*, emails, letters or calls) with their competitors, was "to prevail in establishing arbitration as the acceptable forum for resolving consumer disputes" as explained by an invitation to the first known "Arbitration Coalition" meeting held among the conspirators.  The conspirators had an intense preoccupation with using arbitration to prevent and thwart class proceedings.  By acting jointly, the conspirators could avoid potential pitfalls that could arise from unilateral action, such as the inability to use arbitration "to control class actions," or that issuers might determine that "arbitration does not stop class actions" or that a "rogue or unsophisticated player" may "cause[] all businesses using consumer arbitration to be judged in an unfavorable light."

**Defendants and their co-conspirators were motivated to become well-networked to achieve their common scheme.**  The conspirators' common scheme was motivated by a desire to become well-networked.  Defendants and their co-conspirators perceived the need "to be [] well networked if we are to ultimately prevail" in adopting CBA Clauses.  Invitations alerting conspirators to scheduled meetings or conference calls highlighted the desirability of direct communications among competitors.  An invitation to the May 25, 1999 meeting, held at the Washington D.C. offices of (then) Wilmer Cutler & Pickering, stated the "purpose of the meeting will be to share views and experiences relating to legal issues of common concern" to

the conspirators.  An agenda attached to an invitation to the first known Arbitration Coalition meeting listed as a topic for discussion: "Sharing best practices."  The later-formed In-House Counsel Working Group was a small group of select conspirators' in-house counsel, who sought to "establish a sounding board to share issues that impact our industry."

By becoming well-networked and sharing best practices and discussing issues, Defendants and their co-conspirators could realize the goal of their common scheme to implement and maintain CBA Clauses.  They also could assure that no conspirator would suffer from a "renegade" issuer who would undercut their efforts or cause consumers to react negatively to CBA Clauses.  Further, earlier adopters of CBA Clauses would not see their initial expenditures defending their arbitration clauses wasted if other issuers also implemented arbitration clauses to protect themselves from potential class actions.

**Defendants and their co-conspirators collectively participated in at least 28 known meetings and conference calls in addition to other inter-firm communications concerning arbitration clauses.**  There is no doubt that the conspirators engaged in an extraordinarily high volume of communications concerning CBA Clauses.  At least 28 meetings and conference calls are known to have occurred, beginning in May 1999 and continuing through October 2003.  Other communications also occurred outside the context of these 28 meetings and conference calls.  Throughout these numerous exchanges, Defendants and their co-conspirators shared information about their internal plans concerning CBA Clauses.  The conspirators also discussed how to implement, maintain and protect their clauses.  These communications were among senior in-house counsel who were responsible for, or otherwise integrally involved in, the Defendants' and their co-conspiring banks' (the "Banks") arbitration clause programs.

**Defendants and their co-conspirators engaged in conduct contrary to their self-interests.**  The conspirators acted against their unilateral self-interests through their attendance at, or other participation in, numerous meetings and conference calls where sensitive business information was shared with, by, and/or between competitors.  For example, Discover personnel testified that they viewed their company's class-barring arbitration as a competitive advantage. Yet, just as they implemented their clause, Discover in-house counsel participated in meetings where he promised to provide Discover's competitors with draft FAQs concerning arbitration. Sharing a competitive advantage (or a tool for reducing costs) with a competitor is contrary to each Defendant's self-interest because it eviscerates that competitive advantage.   American Express similarly acted against its unilateral interests by organizing the meetings.  Citi acted against its unilateral interests by attending, or participating in, the meetings and by failing to avail itself of the competitive opportunities presented to it.  The meetings, conference calls and other communications became an avenue through which the conspirators coordinated their decision-making concerning arbitration and implemented CBA Clauses.

**Defendants and their co-conspirators implemented and maintained standardized terms that precluded cardholder participation in class proceedings.**  Each of the CBA Clauses implemented by Defendants and their co-conspirators is materially uniform in one critical aspect: they each bar cardholders from initiating or participating in any form of class or collective proceeding.   Implementing CBA Clauses was the *sine qua non* of the common scheme.   No conspirator deviated from this objective during the course of their meetings, conference calls and other communications.   Nor is the purported "opt out" provision, later adopted by Discover, a meaningful difference.  Discover set the "default" as an "opt-in" for the CBA Clause it wished to maintain, requiring cardholders to act within 30 days by completing a

complicated "opt-out" process.   Rather than represent a genuine alternative, competitively marketed to cardholders in a manner encouraging easy selection, Discover's "opt out" is little more than a mechanism used to defend its clause against legal challenges in Discover's ongoing efforts to maintain the CBA Clause it implemented in concert with its co-conspirators.

**Defendants and their co-conspirators achieved their common objective through the efforts of their in-house counsel.**   The participants in the numerous meetings, conference calls and other communications were in-house counsel of Defendants and their co-conspirators.   In-house counsel promoted, prepared and created the CBA Clauses adopted by the Banks. Defendants' business executives received the concept for CBA Clauses from their in-house counsel.   For all three Defendants, the business executives relied on the advice of their counsel and did little more than "rubber stamp" the decision to add CBA Clauses.   Participants at the Arbitration Coalition meetings understood that arbitration was a "lawyer's tool."   Through the course of the 28 known meetings and conference calls, and other communications, these in-house counsel successfully moved the Banks, who collectively dominate the general purpose card market, to implement and maintain CBA Clauses.

2.   **Group Boycott**

a)   **Elements of Group Boycott Claim**

A group boycott, or concerted refusal to deal, is an agreement among competitors not to deal with a third party.   *See, e.g., Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961).

b)   **A Summary of Facts Relied on to Establish Group Boycott Claim**

Defendants have collectively refused to deal with any cardholder who declined to accept arbitration clauses as a term and condition of their cardholder agreement.   Cardholders who

reject the CBA Clauses have their accounts summarily closed.  Discover's opt-out provision, for the reasons explained below in Part IV.B., does not excuse it from participation in the boycott.

    **3.**    <u>**Unreasonable Restraint of Trade**</u>

    **a)**    <u>**Elements of Unreasonable Restraint of Trade**</u>

Courts review restraints of trade under one of two general categories – restraints illegal "per se" and restraints tested under the "rule of reason."  *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (Cardamone, J.).

Per se restraints are condemned as unreasonable without further inquiry.  *Geneva Pharms. Tech. Corp. v. Barr Labs*., 386 F.3d 485, 506 (2d Cir. 2004).  Horizontal restraints among competitors restricting the terms and conditions of sale are per se restraints.  *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 527 (1983); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (*per curiam*); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609-12 (1972); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978); *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998) (quoting *Topco*, 405 U.S. at 607-08).  Courts have recognized that collusion as to arbitration is a per se violation.  *See  Paramount Famous Lasky*, 282 U.S. at 43-44); *see also Brown*, 518 U.S. at 241; *Indiana Fed'n of Dentists*, 476 U.S. at 458; *NCAA*, 468 U.S. at 110 n.40; *Kartell*, 749 F.2d at  930.

Alternatively, under the rule of reason, Plaintiffs demonstrate anticompetitive effect when they show either (a) anticompetitive conduct (*i.e.*, a restraint of trade) and defendants' market power or (b) actual anticompetitive effect.  Actual anticompetitive effect includes reduced output, increased prices, decreased quality or reduced consumer choice in the marketplace.  *See Virgin Atl. Airways*, 257 F.3d at 264; *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 223-25 (2d

Cir. 2008).  Market power may be shown through market share.  *See Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 385 (S.D.N.Y. 2007) (market power "may be inferred from one firm's large percentage share of the relevant market") (quotation omitted).

**b)**  **A Summary of Facts Relied on to Establish Unreasonable Restraint of Trade**

Defendants' restraint of trade is a combination or conspiracy among direct competitors as to a term or condition of doing business with Defendants' customers, and is therefore condemned as illegal per se.

To the extent that anticompetitive effect need be shown, Defendants' concert of action is an anticompetitive restraint and Defendants and their co-conspirators have at all times held an 80% or greater market share.  The geographic market is the United States.  The relevant product market is general purpose cards – *i.e.*, credit and charge cards.  Actual anticompetitive effect is shown through (1) an increase in the "full price" that Plaintiffs must pay for credit card services; (2) a diminution in the quality of credit cards, as cardholders' ability to prosecute class claims has been diminished; (3) a reduction in the range of market alternatives, *i.e.*, narrowed consumer choice, because credit cards without CBA Clauses are less available; and (4) a reduction in the quantity of credit cards without CBA Clauses.

Defendant Citi has stipulated that it will not offer a "rule of reason" defense.

**IV.  Injunctive Relief Under Section 16 of the Clayton Act**

**A.  Elements**

Under Section 16 of the Clayton Act, "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.  To secure injunctive relief, Class Plaintiffs "need only demonstrate a

significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).

### B.    A Summary of Facts Relied on to Establish Injunctive Relief

Here, threatened loss or damage takes at least four forms here.  First, Defendants' joint imposition of CBA Clauses injures and injured cardholders by increasing the full price of Defendants' general purpose cards.  The full price of a good or service is the full cost to the consumer in addition to the product's nominal or stated price.  The full price of a general purpose card includes the imposition of an arbitration clause that frustrates prevents cardholders from vindicating their legal rights, obtaining redress for the harm they suffer and even enforcing the *other* terms and conditions in their "bargain."  Second, the violation lowers the quality of the card services that general purpose cardholders obtain.  Third, Defendants' conduct reduces the quantity of cards in the market that do not have CBA Clauses.  Fourth, Defendants' conduct restricts cardholders' choice in the marketplace and displaces the available marketplace alternatives from those that prevailed under competitive conditions.

Discover's opt-out neither lessens nor abates the harms to its or others' cardholders.  Because Discover requires its cardholders to opt-out of its CBA Clause (rather that to opt-in), Discover avails itself of cardholder ignorance and the significant costs to consumers of reviewing Discover's terms sheets, as well as behavioral norms, to effectively mandate submission to its CBA Clause.

The settlements also neither lessen nor abate the continuing harm to cardholders because American Express, Citi and Discover cardholders must bear the not insubstantial costs of switching to cards subject to benefit from the settlements.  The Court has twice held the contrary

position to be "absurd" as a matter of law.  2012 WL 401113, at *9 (S.D.N.Y. Feb. 8, 2012); 773 F. Supp. 2d at 373.

## V.     Antitrust Standing, Including Antitrust Injury

### A.     Elements

To have antitrust standing for an injunctive relief claim, a plaintiff must assert "threatened loss or damage" flowing from the violation of the antitrust laws and make a showing that the plaintiff would be an efficient enforcer of the antitrust laws.  *See* 15 U.S.C. 26; *Paycom Billing Servs. Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005).

(1) Higher prices, (2) diminished quality, (3) restricted consumer choice, or (4) reduced output are each injuries to competition that constitute threatened antitrust injury.  *See*, *e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (higher prices); *Int'l Bhd. of Teamsters v. Philip Morris, Inc.*, 196 F.3d 818, 823 (7th Cir. 1999) (Easterbrook, J.) (diminished quality); *AGC*, 459 U.S. at 528 (restricted consumer choice); *Int'l Wood Processors v. Powder Dry, Inc.*, 792 F.2d 416, 427 (4th Cir. 1986) (reduced output).

In the injunctive context, a plaintiff is determined to be an efficient enforcer based on (1) the directness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; and (3) the speculativeness of the alleged injury.  *Daniel*, 428 F.3d at 443.

### B.     A Summary of Facts Relied on to Establish Antitrust Standing, Including Antitrust Injury

The facts relevant to antitrust injury are summarized in Parts III.A.3.b. and IV.B.

Plaintiffs are efficient enforcers.  They are direct purchasers from Defendants and their co-conspirators.  Plaintiffs' injury is direct and they are an identifiable class of persons with self-

interest motivating them to sue.  Their injury is not speculative.  Plaintiffs participate in a market where (1) they are required to accept Defendants' CBA Clauses in order to obtain card services (or to incur the cost of switching to a provider that does not have a CBA Clause), (2) they have the choice of fewer cards without CBA Clauses than during the competitive period, (3) the cards they hold are of lower quality (because remedies are restricted), and (4) their choices among marketplace alternatives have been restricted.

## VI.   Article III Standing

### A.   Elements of Article III Standing

"To establish constitutional standing under Article III, 'a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision.'" *Bank of America*, 524 F.3d at 223 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992))).  Antitrust injury "to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact."  *AGC*, 459 U.S. at 535 n. 31.

### B.   A Summary of Facts Relied on to Establish Article III Standing

The Court of Appeals has held that Plaintiffs have established Article III standing and that decision is law of the case.  *See Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008).  The facts summarized with respect to antitrust standing also support Plaintiffs' assertion of Article III standing.  A favorable decision will result in an injunction terminating Defendants' harmful conduct.

## VII.   Class Certification

### A.   Elements for Class Certification

Certification of an injunctive relief class pursuant to Fed. R. Civ. P. 23 requires that (1) the class be so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims of the representative parties are typical of the claims of the class; (4) the representative parties will fairly and adequately protect the interests of the class; and (5) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. *See* Fed. R. Civ. P. 23(a) & 23(b)(2).

### B.   Summary of Facts Relied on to Establish Class Certification

Citi and Discover have stipulated to class certification.  The Court certified an injunctive relief class as to American Express in September 2005 and there are no circumstances warranting reconsideration of that decision.  *Ross v. American Express Co.*, 2005 WL 2364969 (S.D.N.Y. Sept. 27, 2005).The class has tens of millions of members dispersed across the country.  The claims Class Plaintiffs assert raise questions of law (see discussion above concerning elements of cause of action) that are common for all class members.  Defendants' conduct in imposing class-barring arbitration on their cardholders is common to all class members.  The claims of the representative plaintiffs concerning Defendants' conduct are the same as those of the absent class members.  There are no conflicts between the representative plaintiffs and the class they represent and the representative plaintiffs are represented by competent class counsel.

Dated: December 15, 2012

*Merrill G. Davidoff/ccG*

Merrill G. Davidoff
Charles P. Goodwin
David A. Langer
Nicholas Urban
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 facsimile

Christopher M. Burke
SCOTT + SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
(619) 233-0508 facsimile

*Counsel for Class Plaintiffs*